UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| Ja.B., the student; and M.B. and Jo.B., the student's parents, | Case No. 3:20-cv-00955 |
| Plaintiffs, | Judge William L. Campbell, Jr. |
| v. | Magistrate Judge Alistair E. Newbern |
| WILSON COUNTY BOARD OF EDUCATION d/b/a Wilson County Schools, | |
| Defendant. | |

To:     The Honorable William L. Campbell, Jr., District Judge

## REPORT AND RECOMMENDATION

Ja.B., by and through his mother, M.B., and his father, Jo.B., brings this action under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–1482, appealing a state administrative law judge's (ALJ) decision finding that Defendant Wilson County Board of Education, doing business as Wilson County Schools (WCS), did not deny Ja.B. a free and appropriate public education (FAPE) as required by the IDEA during or after his enrollment at Mount Juliet Middle School (MJMS) and denying Ja.B., M.B., and Jo.B.'s request for compensatory education and reimbursement for Ja.B.'s private school tuition at CATES Academy and Meridell Achievement Center. (Doc. Nos. 1, 16-2.) Before the Court is Ja.B., Jo.B., and M.B.'s motion for judgment on the administrative record. (Doc. No. 23.) WCS has responded in opposition (Doc. No. 28), and Ja.B., Jo.B., and M.B. have filed a reply (Doc. No. 29). Considering the parties' arguments and the administrative record as a whole, and for the reasons that follow,

the Magistrate Judge will recommend that Ja.B., M.B., and Jo.B.'s motion for judgment on the administrative record be denied and the ALJ's decision be affirmed.

## I. Background

### A. The IDEA

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A).[1] The IDEA defines a FAPE as:

> special education and related services that—
>
> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

*Id.* § 1401(9)(A)–(D). To be considered a "child with a disability" under the IDEA, a child must have (1) "intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance . . . , orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and" (2) must, "by reason thereof, need[ ] special education and related services." *Id.* § 1401(3)(A).

---

[1]      All citations to the U.S. Code and Code of Federal Regulations refer to their current versions. The relevant federal statutes and regulations have not substantively changed since the events at issue in this action occurred.

In exchange for federal funding, the IDEA requires states to identify, locate, and evaluate "[a]ll children with disabilities residing in the State . . . who are in need of special education and related services[.]" *Id.* § 1412(a)(3)(A). This mandate is known as the child find requirement, an affirmative obligation of every local educational agency (LEA) to identify students who are reasonably suspected of having disabilities and to evaluate those students to determine whether they are eligible for special education services. *Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007). The child find requirement is not limited to children enrolled in the public school system; it extends to "[a]ll children with disabilities residing in the State, including . . . children with disabilities attending private schools . . . ." 20 U.S.C. § 1412(a)(3)(A); *see also Doe v. Metro. Nashville Pub. Schs.*, 9 F. App'x 453, 455 (6th Cir. 2001).

Before a child may receive special education services, an LEA "shall conduct a full and individual initial evaluation" "to determine whether [the] child is a child with a disability" as defined in 20 U.S.C. § 1401 and "to determine the educational needs of such child." 20 U.S.C. § 1414(a)(1)(A), (C)(i)(I)–(II). If a student is found to be a child with a disability who is in need of special education or related services, the LEA is "required to establish an [individualized education program (IEP)] for each child with a disability." *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 853 (6th Cir. 2004). "[T]he IEP must contain a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress." *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 763 (6th Cir. 2001); *see also* 20 U.S.C. § 1414(d)(1)(A) (defining requirements for IEPs).

The IDEA requires that students are to be educated "in the 'least restrictive environment' (LRE) possible[.]" *L.H. v. Hamilton Cnty. Dep't of Educ.*, 900 F.3d 779, 788 (6th Cir. 2018)

(quoting 20 U.S.C. § 1412(a)(5)). This means that, "[t]o the maximum extent appropriate, children with disabilities . . . [must be] educated with children who are not disabled" and may be educated separately "only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). IDEA regulations further provide that, "[u]nless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled[.]" 34 C.F.R. § 300.116(c). The Sixth Circuit has recognized that there are exceptions to the IDEA's preference for mainstreaming children with disabilities "when: (1) the student would not benefit from regular education; (2) any regular-class benefits would be far outweighed by the benefits of special education; or (3) the student would be a disruptive force in the regular class." *L.H.*, 900 F.3d at 789; *see also* 34 C.F.R. § 300.116(d) ("In selecting the LRE, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs[.]").

An LEA must provide a student's parents with prior written notice within a reasonable time before it proposes to initiate or change, or refuses to initiate or change, the identification, evaluation, educational placement or provision of a FAPE to a child with a disability. 20 U.S.C. § 1415(b)(3); 34 C.F.R. § 300.503(a). If a change in placement is considered for disciplinary reasons, the student is entitled to a manifestation determination review, in which the LEA, the student's parents, and members of the student's IEP team must determine whether the student's conduct was a manifestation of his or her disability. 20 U.S.C. § 1415(k)(1); 34 C.F.R. § 300.530.

A parent with concerns about "any matter relating to" the child's identification, evaluation, and educational placement may file a complaint to the school district and is entitled to an administrative due process hearing on the complaint. 20 U.S.C. § 1415(b)(6), (f), (g). Any party

aggrieved by the state educational agency's final decision may file a civil action in federal district court. *Id.* § 1415(i)(2)(A). The IDEA empowers courts to "grant such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C)(iii).

**B.** **Section 504 of the Rehabilitation Act of 1973**[2]

Students with disabilities may also receive services under § 504 of the Rehabilitation Act of 1973, which provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a). Section 504's implementing regulations require that students with disabilities have equal access to public schools and that they receive a FAPE regardless of the nature or severity of their disabilities. 34 C.F.R. § 104.33. Section 504 applies to all students who have mental or physical impairments, who have a record of physical or mental impairments, or who are regarded as having a mental or physical impairment, if the impairment substantially limits one or more major life activities. *Id.* § 104.3(j). Like the IDEA, § 504's implementing regulations contain a child find obligation, requiring school districts to identify, locate, and evaluate children with disabilities. *Id.* §§ 104.32, 104.35.

While "both statutes require the states to provide disabled children with a FAPE and impose child find obligations," "[a] principal difference between section 504 and the IDEA relates to the specific students covered by the statutes." *B.H. v. Portage Pub. Sch. Bd. of Educ.*, No. 1:08-cv-293, 2009 WL 277051, at *6 (W.D. Mich. Feb. 2, 2009). Section 504 prohibits discrimination

---

[2]        Jo.B., M.B., and Ja.B. do not bring claims under § 504 in this action. Some background on that statute is useful in understanding their allegation that WCS denied Ja.B. a FAPE by providing him with a § 504 plan but not an IEP.

against students with disabilities as defined in 34 C.F.R. § 104.3(j), while the IDEA protects the "subsection" of those students who also "need special education and related services as a result of that disability." *B.H.*, 2009 WL 277051, at *6; *see also* 20 U.S.C. § 1401(3)(A). Accordingly, all students who qualify for special education under the IDEA are also protected by § 504, but not all students with disabilities under § 504 are eligible for special education under the IDEA. *B.H.*, 2009 WL 277051, at *6.

### C. Factual Background

#### 1. Pre-Enrollment Background

Ja.B. was born in July 2004 and was adopted at birth by M.B. and Jo.B. (Doc. No. 16-3, PageID# 868; Doc. No. 16-5, PageID# 2029.) Until 2017, Ja.B. and his family lived in Bourbonnais, Illinois, where Ja.B. was enrolled in Bourbonnais Elementary School District Number 53 from kindergarten through seventh grade. (Doc. No. 16-3, PageID# 868, 1407.) Ja.B. began having difficulty regulating his emotions at age two, which led to "rages" involving "verbal abuse, property destruction, throwing things, [and] kicking things" until his parents would "have to physically restrain him" or take him to the emergency room. (*Id.* at PageID# 882–83, 1409–1410.)

Beginning in elementary school, Ja.B. saw several therapists and psychiatrists who tested him but did not make a formal diagnosis.[3] (*Id.* at PageID# 869, 1149–52, 1241, 1243, 1411.) He did not have an IEP, § 504 plan, or school safety plan in Illinois, but Jo.B. and M.B. communicated regularly with Ja.B.'s teachers and a school social worker. (*Id.* at PageID# 871, 1242, 1340.) At

---

[3] M.B. testified that one therapist believed that Ja.B. had attention deficit hyperactivity disorder, but M.B. and Jo.B. "really didn't feel he met the criteria for" that diagnosis and found a different therapist. (Doc. No. 16-3, PageID# 1241.) She also testified that another therapist in Illinois believed that Ja.B. had anxiety "but it was not a medical diagnosis from a psychiatrist or a doctor." (*Id.* at PageID# 1243.)

the beginning of each school year, they also sent a letter to Ja.B.'s teachers to inform them of his background and behavioral challenges. (*Id.* at PageID# 871–72, 878–79.) Ja.B. engaged in some disruptive behavior at school, but his parents' testimony and his school records reflect that any school behavioral issues were minor and that he was meeting academic standards. (*Id.* at PageID# 869–71, 1147–49, 1241–42, 1408–09, 1478, 1673–78, 1755–56, 1824–26; Doc. No. 16-10, PageID# 2472–74.)

### 2. Move to Tennessee and Enrollment in WCS

#### a. Summer 2017

Ja.B.'s family moved from Bourbonnais, Illinois, to Mount Juliet, Tennessee, in July 2017. (Doc. No. 16-3, PageID# 868.) In the spring of 2017, Jo.B. and M.B. contacted MJMS to ask if Ja.B. could tour the school before the 2017–2018 school year began so that he could get comfortable with the building. (*Id.* at PageID# 879–81.) Although they were initially told that the school could not accommodate a tour during the summer, Ja.B. and M.B. were able to visit MJMS in person before school started. (*Id.* at PageID# 881, 1243–45.) When M.B. visited MJMS in July 2017 to register Ja.B. for eighth grade, she spoke with Jade Yow Bowman, the school counselor assigned to Ja.B.'s grade. (*Id.* at PageID# 879–80, 1246–49, 1491–96.) M.B. told Bowman that a social worker in Illinois had provided support when Ja.B.'s behavior became difficult and asked for the name of a social worker at MJMS. (*Id.* at PageID# 1247.) Bowman told M.B. that MJMS did not have a school social worker but that she would serve as Ja.B.'s school counselor that year. (*Id.* at PageID# 1247–48, 1495.)

#### b. August 2017

Ja.B.'s first day at MJMS was August 1, 2017. (*Id.* at PageID# 1493.) On August 16, 2017, he received a discipline referral and one day of in-school suspension for arguing with other students, refusing to do his schoolwork, and defying his teacher's instructions to re-enter the

classroom. (*Id.* at PageID# 1019, 1346, 157476; Doc. No. 16-5, PageID# 2085.) After school ended that day, M.B. and Jo.B. sent a letter to Ja.B.'s MJMS teachers, Bowman, and MJMS assistant principal Chareda Sims. (Doc. No. 16-3, PageID# 886–91, 893–94, 1248–50, 1569–70; Doc. No. 16-4, PageID# 1920–25.) Like the yearly letters M.B. and Jo.B. sent to Ja.B.'s teachers in Illinois, the letter explained Ja.B.'s background, including his adoption, history of behavior problems at home, and the fact that he had been in therapy for years, suffered from anxiety, and had threatened self-harm in the past. (Doc. No. 16-4, PageID# 1920–25.) The letter also explained that Ja.B. "d[id] not have a diagnosis, IEP, or receive school services[;]" that he engaged in "shenanigans" at school; and that M.B. and Jo.B. hoped to foster a partnership with Ja.B.'s teachers and share strategies for managing his behavior. (*Id.* at PageID# 1921–22.) Jo.B. testified that this letter was not intended to serve as a § 504 or IEP request. (Doc. No. 16-3, PageID# 1156–57.)

At home, Ja.B.'s rage behaviors began to escalate, and he threatened to harm himself and his family. (*Id.* at PageID# 882–83, 1008–09.) On August 24, 2017, M.B. told MJMS staff about these rages. (*Id.* at PageID# 1272–73, 1472.) Four days later, M.B. told Ja.B.'s teachers that Ja.B. was refusing to do homework and otherwise having "very difficult days" at home, which his parents attributed to anger about the move from Illinois to Tennessee. (Doc. No. 16-4, PageID# 1960.) M.B. followed up on August 31, 2017, to let Ja.B.'s school team know that "there ha[d] been a significant, positive shift" in Ja.B.'s behavior and that he had started seeing a new counselor. (*Id.* at PageID# 1959.)

### c. September 2017

Ja.B.'s at-home rage behaviors escalated again during the first week of September, leading M.B. and Jo.B. to take him to the emergency room on September 4, 2017. (Doc. No. 16-3, PageID# 883–84, 1018.) After that hospital visit, Ja.B. told his parents "that he felt like a lot of [his behavior] was coming from th[e] move" from Illinois to Tennessee. (*Id.* at PageID# 1021.)

M.B. emailed Bowman on September 8, 2017, to let her know that Ja.B. continued to struggle with rage and refusing to do homework. (Doc. No. 16-4, PageID# 1961.) She said that she did not know how to sign up for the parent-teacher conferences scheduled to be held the following week, did not know about support resources and activities available at MJMS, and wondered whether "it [wa]s time to set up a meeting with [Ja.B.]'s team[.]" (Doc. No. 16-3, PageID# 1023–24, 1472; Doc. No. 16-4, PageID# 1961.)

On September 11, 2017, Alaina Hatfield, Ja.B.'s math teacher, emailed M.B. and Jo.B. that, after she moved Ja.B.'s seat because he was "antagonizing . . . another student[,]" Ja.B. disrupted class with a flashlight and other items in his backpack, refused to complete the day's assignment, and continued to act defiantly despite redirection. (Doc. No. 16-3, PageID# 1019, 1387; Doc. No. 16-4, PageID# 1962.) She also told them that Ja.B.'s refusal to do homework or cooperate with class work and assessments was causing his grades to suffer, and that continued misbehavior could result in a disciplinary referral. (Doc. No. 16-3, PageID# 1387; Doc. No. 16-4, PageID# 1962.) Hatfield forwarded these concerns to Bowman, who recommended that Jo.B. and M.B. attend MJMS's upcoming parent-teacher conferences, where they could speak individually with all of Ja.B.'s teachers. (Doc. No. 16-3, PageID# 1024–25; Doc. No. 16-4, PageID# 1963.) Bowman also encouraged M.B. and Jo.B. to schedule conferences with her and with Ja.B.'s teachers, look into after-school homework support services, and remind Ja.B. of the consequences he could face under the school's discipline policy. (Doc. No. 16-3, PageID# 1028–29; Doc. No. 16-4, PageID# 1963.)

Instead of attending parent-teacher conferences, M.B. and Jo.B. requested a single meeting with all of Ja.B.'s teachers. (Doc. No. 16-3, PageID# 1421.) On September 19, 2017, M.B. and Jo.B. met with Ja.B.'s teachers, Sims, and Bowman. (*Id.* at PageID# 1034, 1347, 1421–22, 1473.)

Jo.B., M.B. and Ja.B.'s teachers shared their observations about Ja.B.'s behavior and discussed strategies to address Ja.B.'s work refusal, including tutoring and using an agenda to track assignments. (*Id.* at PageID# 1033–35, 1347–48; Doc. No. 16-4, PageID# 1966–67.) Bowman suggested that Ja.B. begin participating in small-group counseling sessions, gave the family a list of tutoring resources to support homework completion, and met with Ja.B. separately to discuss how he would be expected to use his agenda. (Doc. No. 16-3, PageID# 1167; Doc. No. 16-4, PageID# 1966–67, Doc. No. 16-10, PageID# 2477–78.)

On September 20, 2017, Ja.B. received two days of in-school suspension for disrupting class. (Doc. No. 16-3, PageID# 1019, 1039, 1041, 1347, 1560–62; Doc. No. 16-5, PageID# 2084.) At home that evening, Ja.B. "flew into a rage, damage[ed] things . . . ," and threatened to kill himself and his family. (Doc. No. 16-3, PageID# 1039–40.) His parents took him to the emergency room, and he was admitted to Vanderbilt Psychiatric Hospital for inpatient treatment. (*Id.* at PageID# 883–84, 1026, 1039–40, 1473.) The next day, M.B. emailed Ja.B.'s teachers, Sims, and Bowman to inform them that Ja.B. had been hospitalized. (*Id.* at PageID# 1041–42; Doc. No. 16-4, PageID# 1968.) Jo.B. later sent an update stating that Ja.B. would likely be hospitalized for five to seven days and asking his teachers to send schoolwork for him to complete in the hospital. (Doc. No. 16-3, PageID# 1042–43; Doc. No. 16-4, PageID# 1972.) Bowman responded that M.B. should "communicate with [her] if there are any limitations for when [Ja.B.] returns to school that the doctor suggests." (Doc. No. 16-4, PageID# 1977.) M.B. then told Bowman that she believed that Ja.B. would "leave [the hospital] with a diagnosis and treatment plan, including steps towards a 504 for him for school . . . ." (*Id.*) Bowman asked the family to meet with her to discuss Ja.B.'s return to school, including "any safety plans [and] updates on medication[.]" (*Id.* at PageID# 1984–85.)

Ja.B. was discharged from Vanderbilt on September 27, 2017, and was cleared to return to school on the following Monday, October 2, 2017. (*Id.* at PageID# 1983, 1986–89.) Jo.B. and M.B. met with Bowman on September 28, 2017, to discuss Ja.B.'s transition back to school, diagnoses, medication, and the possibility of developing a § 504 plan or IEP. (Doc. No. 16-3, PageID# 1044–45, 1048, 1052–54, 1473, 1580; Doc. No. 16-10, PageID# 2448, 2477–78.) They gave Bowman a copy of Ja.B.'s discharge paperwork, which stated that Dr. Edwin Williamson, a Vanderbilt psychiatrist, had given Ja.B. a diagnosis of "[u]nspecified disruptive, impulse control, and conduct disorder, Generalized Anxiety Disorder" and recommended that the school implement a § 504 plan. (Doc. No. 16-3, PageID# 1044–45, 1053–54, 1473, 1484–85, 1632; Doc. No. 16-4, PageID# 1986–89.) Ja.B.'s teaching team planned to reconvene on October 30, 2017, to review data, give Ja.B. the chance to adapt to newly-prescribed medications, and begin the § 504 process. (Doc. No. 16-3, PageID# 1057, 1474; Doc. No. 16-4, PageID# 1997–99.)

### d.      October 2017

MJMS students went on fall break for the first two weeks of October. (Doc. No. 16-3, PageID# 1348, 1473–74.) On October 19, 2017, shortly after he returned from fall break, Ja.B. received two discipline referrals in one day. (*Id.* at PageID# 1348–49; Doc. No. 16-5, PageID# 2084.) First, he received two class periods of in-school suspension for disrupting class and disobeying a teacher's instructions. (Doc. No. 16-3, PageID# 1576–77; Doc. No. 16-5, PageID# 2084.) He received a second referral for cursing at a librarian. (Doc. No. 16-3, PageID# 1577; Doc. No. 16-5, PageID# 2084.)

At the end of the school day on Friday, October 27, 2017, a teacher asked Ja.B. to step away from a fight that was occurring in the gym; "[h]e refused and began cursing her out." (Doc. No. 16-3, PageID# 1058–59; Doc. No. 16-5, PageID# 2084.) He headed toward his bus, disregarding the teacher's and the seventh-grade assistant principal's instructions to stop. (Doc.

No. 16-3, PageID# 1058–59; Doc. No. 16-5, PageID# 2084.) He cursed at the assistant principal and refused to exit the bus, which resulted in the school resource officer (SRO) being called. (Doc. No. 16-3, PageID# 1059; Doc. No. 16-5, PageID# 2084.) Ja.B., who "continued to yell profanities" at the SRO, was handcuffed, arrested, and charged with disorderly conduct and resisting arrest.[4] (Doc. No. 16-3, PageID# 1059, Doc. No. 16-5, PageID# 2084.) Ja.B. received an out-of-school suspension pending a School Disciplinary Hearing Authority (SDHA) hearing to determine if he would be placed at M.A.P. Academy, an alternative school in WCS. (Doc. No. 16-3, PageID# 1061, 1067–69, 1257–58, 1264, 1310–11, 1327–28; Doc. No. 16-5, PageID# 2084; Doc. No. 16-10, PageID# 2430–47.)

Ja.B.'s teaching team conducted a § 504 meeting with Jo.B. and M.B. as scheduled on Monday, October 30, 2017. (Doc. No. 16-3, PageID# 1062, 135455.) The team discussed the necessary steps to develop a § 504 plan for Ja.B. and the ramifications of Ja.B.'s arrest, including the SDHA hearing. (Doc. No. 16-3, PageID# 1064, 1067–71, 1257–58, 1327–28.) M.B. and Jo.B. testified that they asked MJMS principal Lee Anne Rainey to conduct neuropsychological testing, but Rainey testified that she did not recall that request being made. (*Id.* at PageID# 1076, 1255, 1336, 1400.)

### 3.    Withdrawal from WCS

On November 6, 2017, concerned that private schools would not admit Ja.B. if he were placed at M.A.P. Academy, Jo.B. and M.B. withdrew Ja.B. from WCS. (*Id.* at PageID# 1069–72, 1257.) As a result of this withdrawal, the SDHA hearing did not take place. (*Id.* at PageID# 1264.) When Ja.B. withdrew from WCS, his grade report showed that he had one A, one B, three C's, and one incomplete. (*Id.* at PageID# 1489, 1587; Doc. No. 16-10, PageID# 2446.)

---

[4]        These charges against Ja.B. were later dropped. (Doc. No. 16-3, PageID# 1073.)

On November 21, 2017, M.B. and Jo.B. met with Ja.B.'s teaching team to finalize Ja.B.'s § 504 plan. (Doc. No. 16-3, PageID# 1075, 1265, 1357–59; Doc. No. 16-5, PageID# 2095.) The § 504 plan identified Ja.B.'s impairments as Generalized Anxiety Disorder and "Other – Conduct Disorder[.]" (Doc. No. 16-5, PageID# 2093.) The accommodations in the plan were based on input from Ja.B.'s teachers, parents, and administrators and included preferential seating, a classroom behavior log, small-group testing, access to a calming space, student opportunities, reinforcement, and cues to stay on task. (Doc. No. 16-3, PageID# 1359; Doc. No. 16-5, PageID# 2089–96.)

After Ja.B. was rejected from two private schools, M.B. homeschooled him for the remainder of the 2017–2018 school year. (Doc. No. 16-3, PageID# 1071–75.) Ja.B. also participated in weekly classes at a homeschool tutorial center. (*Id.* at PageID# 1074.) Meanwhile, M.B. and Jo.B. continued to search for a private placement for Ja.B. (*Id.* at PageID# 1085–87.)

In February 2018, Ja.B.'s parents requested a meeting with Rainey in which they asked her to modify Ja.B.'s disciplinary records because they were having difficulty enrolling him in a private school. (*Id.* at PageID# 1360, 1481–82.) Rainey told them that WCS's practice was not to expunge disciplinary records. (*Id.* at PageID# 1360–61.) During that meeting, Jo.B. also told Rainey that the family had obtained a private neuropsychological evaluation from Dr. Jackie Klaver, who diagnosed Ja.B. with bipolar disorder, oppositional defiance disorder, and disruptive mood dysregulation disorder (DMDD). (*Id.* at PageID# 895–96, 1078, 1262–63.)

In June 2018, Jo.B. and M.B. met with WCS § 504 coordinator Tammy Crane to explain their experience in the district and to tell her that WCS needed to "do better." (*Id.* at PageID# 1083–84, 1644, 1657.) They told Crane about Klaver's evaluation and discussed whether a SDHA hearing would be needed if Ja.B. ever returned to WCS, but did not express any intention to reenroll Ja.B. in WCS at that time. (*Id.* at PageID# 1083–84.) After the meeting, M.B. sent Crane

a follow-up email stating that she and Jo.B. "came into the meeting with the goal of expressing how [they] believe [WCS] can and should do better for students with mental health challenges . . . ." (Doc. No. 16-10, PageID# 2425–26.) M.B. did not request an IEP evaluation for Ja.B. or identify any immediate next steps in the email. (*Id.*) She stated that the family "d[id] not feel re-enrolling [Ja.B.] in the district is what is best[,]" but that they "may revisit re-enrolling him" "should [their] current education plan be unsuccessful[.]" (*Id.*)

### 4. 2018–2019 School Year

Jo.B. and M.B. found a private placement for Ja.B. at CATES Academy for the 2018–2019 school year. (Doc. No. 16-3, PageID# 1087.) Ja.B.'s rage behaviors continued at CATES Academy and at home, and he was admitted to Vanderbilt Psychiatric Hospital for inpatient treatment in November 2018 and January 2019. (*Id.* at PageID# 1094, 1175–76.) After Ja.B. was discharged from Vanderbilt in January 2019, his parents placed him in Meridell Achievement Center, a residential mental health treatment facility in Texas, from January through March 2019. (*Id.* at PageID# 896, 1094–96.) A psychiatrist at Meridell diagnosed Ja.B. with attention deficit hyperactivity disorder, DMDD, and anxiety. (*Id.* at PageID# 896.) M.B. testified that the "medication and psychiatric help" Ja.B. received at Meridell "revolutionized our world" and has made a "night and day differen[ce]" for Ja.B. (*Id.* at PageID# 1099.) Ja.B. was discharged from Meridell in March 2019 and returned to CATES Academy for the remainder of the 2018–2019 school year. (*Id.* at PageID# 1100.)

### D. Procedural Background

### 1. Due Process Hearing

On May 1, 2019, M.B., Jo.B., and Ja.B. filed a due process complaint alleging that WCS denied Ja.B. a FAPE for the 2017–2018 and 2018–2019 school years by failing to evaluate him for special education services under the IDEA's child find mandate. (Doc. No. 16, PageID# 71–

81.) They requested reimbursement for the costs of Ja.B.'s placement at CATES Academy and Meridell. (*Id.*) After the parties engaged in a resolution session as required by 34 C.F.R. § 300.510, the school district agreed to conduct an initial evaluation for special education eligibility. (*Id.* at PageID# 94.) School psychologist Josh Couts completed a comprehensive psychoeducational evaluation of Ja.B. in August 2019 and found that he was eligible for special education services as a child with an emotional disturbance. (Doc. No. 16-5, PageID# 2029–2054.)

M.B., Jo.B., and Ja.B. amended their due process complaint on November 27, 2019, adding claims that WCS took actions related to Ja.B.'s 2019 eligibility determination that denied Ja.B. a FAPE for the 2019–2020 school year and retaliated against Ja.B. for asserting his rights under the IDEA. (Doc. No. 16, PageID# 122–134.) An ALJ in the Tennessee Department of Education Division of Special Education presided over a due process hearing on June 16–19, 2020. (Doc. No. 16-3.) Jo.B. and M.B. testified at the hearing, as did Cates, Rainey, Bowman, Sims, and Crane. *Id.*) Additional witnesses testifying for Ja.B. included Dr. Eboni N. Webb, Julie Spies, Ava Cozart, Kent Robson, Dawn Bradley, and Jeremy Willis; additional witnesses testifying for WCS included Angela Barnes, Nicole Kanew, and Dr. Clovis Stair. (*Id.*)

During the administrative hearing, counsel for Jo.B., M.B., and Ja.B. attempted to introduce evidence or refer to arguments that were not raised in the original or amended complaints, including whether the school was required to hold a manifestation determination review after the October 27, 2017 disciplinary incident and whether WCS violated the IDEA's prior written notice requirements. (*Id.* at PageID# 1310–13, 1332–35, 1854–55.) The ALJ informed the parties that arguments not raised in the complaint were "not before [her]." (*Id.* at PageID# 1333, 1854–55.) Jo.B., M.B., and Ja.B. dropped their retaliation claims at the hearing,

and the parties opted not to present testimony related to the 2019 evaluation and eligibility determination. (*Id.* at PageID# 1364–70.)

The ALJ's final order, issued on September 21, 2020, did not address the 2019 evaluation and eligibility determination or any allegations related to the IDEA's prior written notice or manifestation determination review requirements. (Doc. No. 16-2, PageID# 779–798.) The ALJ found that:

- In light of the information from [Ja.B.]'s prior school, the additional information provided by his parents, the absence of an official diagnosis, and their own observations, MJMS had no reason to evaluate [Ja.B.] for Special Education services. Nothing in [Ja.B.]'s records from Illinois or the information provided by his parents suggested that [Ja.B.] had a disability which warranted an evaluation for Special Education Services. (*Id.* at PageID# 793, ¶ 10.)

- Based on the 3 months available to MJMS and the information about [Ja.B.] that had already been provided, MJMS did not deny [Ja.B.] a FAPE or otherwise violate the IDEA by failing to evaluate [Ja.B.] for Special Education services prior to his disenrollment. (*Id.* at PageID# 795, ¶ 22.)

- Neither did MJMS violate the IDEA by choosing not to evaluate [Ja.B.] for Special Education services following his disenrollment. The record does not show any additional information about Ja.B. provided to MJMS following his disenrollment that would have suggested the need for specialized instruction through an IEP in order to access his education and receive a FAPE. (*Id.* at ¶ 23.)

- The facts alleged by the Petitioners have not shown a violation of the IDEA. For this reason, and because [Ja.B.] had not "previously received special education and related services under the authority of a public agency," he is not eligible for reimbursement of his private school tuition." (*Id.* at ¶ 24 (citation omitted).)

- Neither does a claim pursuant to Section 504 entitle the Petitioners to any relief. . . . The evidence in the record does not substantiate any negligence by MJMS in undertaking the evaluation for a 504 Plan, much less any bad faith or gross misjudgment that is required to recover under Section 504. (*Id.* at PageID# 796, ¶¶ 25, 27.)

## 2. Federal District Court Proceedings

Jo.B., M.B., and Ja.B. initiated this action by filing a complaint under 20 U.S.C. § 1415(i)(2), alleging that (1) WCS denied Ja.B. a FAPE during the 2017–2018, 2018–2019, and 2019–2020 school years by failing to identify and evaluate him for special education services, failing to design and implement an IEP for those school years, and not holding a manifestation determination review after Ja.B.'s October 27, 2017 disciplinary incident; (2) CATES Academy was an appropriate private placement for Ja.B.; (3) Ja.B. is entitled to compensatory education for the time period of August 2017 through the date of decision; and (4) Ja.B.'s parents are entitled to reimbursement for the cost of Ja.B.'s private educational placement. (Doc. No. 1.) WCS filed an answer to the complaint, in which they argue that the district court has no jurisdiction to hear any claims that were not raised and decided in the underlying due process hearing, including any claims related to a manifestation determination review. (Doc. No. 11.)

Jo.B., M.B., and Ja.B. filed a motion for judgment on the administrative record (Doc. No. 23), WCS responded (Doc. No. 28), and Jo.B., M.B., and Ja.B. filed a reply (Doc. No. 29.) Jo.B., M.B., and Ja.B. argue that (1) WCS violated the IDEA's child find mandate and denied Ja.B. a FAPE by failing to identify and evaluate him for special education services; (2) WCS denied a request for an evaluation by Jo.B. and M.B. without providing prior written notice; (3) Jo.B. and M.B. are entitled to reimbursement for the cost of Ja.B.'s private placements at CATES Academy and Meridell; and (4) Ja.B. is entitled to compensatory education for WCS's denial of FAPE for the 2017–2018 school year. (Doc. No. 24.) WCS responds that (1) it did not violate its child find mandate or deny Ja.B. a FAPE because it did not overlook clear signs of disability and provided him with interventions and supports; (2) Jo.B., M.B., and Ja.B. did not exhaust their claims that WCS refused a parent request for a special education evaluation, failed to provide prior written notice, or failed to hold a manifestation determination review; and (3) Jo.B., M.B., and Ja.B. are

not entitled to tuition reimbursement or compensatory education because CATES Academy and Meridell are not appropriate placements under the IDEA. (Doc. No. 28.) Jo.B., M.B., and Ja.B. reply that (1) they exhausted their claims regarding parental requests for evaluation, prior written notice, and the lack of a manifestation determination review because those claims are part of their properly exhausted Child Find claim; and (2) CATES Academy is an appropriate placement for Ja.B. (Doc. No. 29.)

## II.      Legal Standard

The IDEA provides that a court reviewing an administrative determination "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(i)–(iii). "The Supreme Court has construed this provision to mean that an initial reviewing court should make an independent decision based on the preponderance of the evidence, but also should give 'due weight' to the determinations made during the state administrative process." *McLaughlin v. Holt Pub. Schs. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)).

The amount of weight due to a state agency's findings "will vary, depending on whether the court is reviewing procedural or substantive matters and whether educational expertise is essential to the administrative findings." *Burilovich v. Bd. of Educ. of Lincoln Consol. Schs.*, 208 F.3d 560, 566 (6th Cir. 2000). When reviewing procedural issues, "a court should 'strictly review'" whether the school complied with the IDEA's procedural requirements. *Id.* (quoting *Dong v. Bd. of Educ. of Rochester Cmty. Schs.*, 197 F.3d 793, 800 (6th Cir. 1999)); *see also Deal*, 392 F.3d at 854 (same). However, a finding that a school district violated the procedural requirements of the IDEA will entitle a child or parent to relief only where the violation caused substantive harm.

*Knable*, 238 F.3d at 764. To establish a procedural violation of the IDEA's child find mandate, "the claimant 'must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate.'" *L.M.*, 478 F.3d at 313 (quoting *Clay T. v. Walton Cnty. Sch. Dist.*, 952 F. Supp. 817, 823 (M.D. Ga. 1997)). With respect to substantive issues, courts "must keep in mind that the state and local educational agencies are deemed to possess expertise in education policy and practice." *Burilovich*, 208 F.3d at 567; *see also Rowley*, 458 U.S. at 207 ("The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the [IDEA] to state and local educational agencies in cooperation with the parents or guardian of the child."). "As a result, less weight is due to an agency's determinations on matters for which educational expertise is not relevant, so that a federal court would be just as well suited to evaluate the situation[,]" while "[m]ore weight is due to an agency's determinations on matters for which educational expertise would be relevant." *Burilovich*, 208 F.3d at 567.

### III.     Analysis

#### A.      Administrative Exhaustion

The IDEA's statutory framework requires that claimants administratively exhaust their claims before filing suit. *Perez v. Sturgis Pub. Schs.*, 3 F.4th 236, 239–40 (6th Cir. 2021); 20 U.S.C. § 1415(i)(2), (l). The exhaustion requirement "enables the agency to develop a factual record, to apply its expertise to the problem, to exercise its discretion, and to correct its own mistakes, and is credited with promoting accuracy, efficiency, agency autonomy, and judicial economy." *Donoho ex rel. Kemp v. Smith Cnty. Bd. of Educ.*, 21 F. App'x 293, 296 (6th Cir. 2001) (quoting *Christopher W. v. Portsmouth Sch. Comm.*, 877 F.2d 1089, 1094 (1st Cir. 1989)). Through it, "[f]ederal courts—generalists with no expertise in the educational needs of

handicapped students—are given the benefit of expert factfinding by a state agency devoted to this very purpose." *Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 873 F.2d 933, 935 (6th Cir. 1989). The Sixth Circuit has held that full development of the administrative record provided by the exhaustion requirement is necessary because, "[w]ere federal courts to set themselves up as the initial arbiters of handicapped children's educational needs before the administrative process is used, they would endanger not only the procedural but also the substantive purposes of the Act." *Id.* An exception to the exhaustion requirement applies if the administrative process "'would be futile or inadequate to protect the plaintiff's rights'" or "'if the plaintiffs were not given full notice of their procedural rights under the IDEA.'" *Donoho*, 21 F. App'x at 297 (quoting *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 917 (6th Cir. 2000)). The burden of demonstrating that either of these exceptions applies "rests on the party seeking to bypass the administrative procedures." *Covington*, 205 F.3d at 917 (citing *Honig v. Doe*, 484 U.S. 305, 327 (1988)).

Jo.B., M.B., and Ja.B.'s original and amended due process complaints do not allege that they made a formal request for a special education evaluation during the 2017–2018, 2018–2019, or 2019–2020 school years; that WCS failed to comply with the IDEA's prior written notice requirements; or that WCS failed to hold a manifestation determination review after the October 27, 2018 disciplinary incident. The IDEA provides that a claimant "shall not be allowed to raise issues at the due process hearing that were not raised in the [due process complaint], unless the other party agrees otherwise." 20 U.S.C. § 1415(f)(3)(B); *see also* 34 C.F.R. § 300.511(d). During the administrative hearing, WCS objected to attempts by the plaintiffs' counsel to raise issues outside the pleadings. (Doc. No. 16-3, PageID# 1310–13, 1332–35, 1854–55.) The ALJ found that arguments not raised in the pleadings were "not before [her]" (Doc. No. 16-3, PageID# 1333, 1854–55), and noted in her final order that, "[a]s clearly specified in the IDEA and its

implementing regulations, no issues shall be addressed in this Order that were not properly alleged in either due process complaint or at any time during the hearing[,]" specifically identifying the manifestation determination review as one such issue (Doc. No. 16-2, PageID# 797, 798 n.10.)

Jo.B., M.B., and Ja.B. do not invoke any exception to the administrative exhaustion requirement in this action. Instead, they argue that any issues related to denial of a formal request for evaluation, prior written notice, and the manifestation determination were fully exhausted because those issues are "part of the Complaint's allegation that [WCS] failed in its Child Find obligations." (Doc. No. 29, PageID# 2561.) That argument fails to recognize the distinct nature of those procedural claims under the IDEA.

The IDEA imposes procedural requirements that LEAs must follow when they "refuse[ ] to initiate or change" "the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to the child[,]" 20 U.S.C. § 1415(b)(3), which include the provision of prior written notice, *id.* § 1415(c)(1). The statute imposes a separate requirement that school personnel determine whether a behavioral problem was a manifestation of a child's disability before taking disciplinary action that would amount to a change in educational placement for that child. *Id.* § 1415(k). Although an LEA carrying out its child find obligation must follow these provisions of the IDEA, these requirements are set out in different parts of the statute than the IDEA's child find requirements. *Id.* § 1412(a)(3). Claims involving the IDEA's prior written notice and manifestation determination requirements require specific factual inquiries that are distinct from the factual inquiry involved in a child find claim. *See M.G. ex rel. C.G. v. Williamson Cnty. Schs.*, 720 F. App'x 280, 284–85 (6th Cir. 2018) (considering child find claims separately from prior written notice claims); *Zdrowski v. Rieck*, 119 F. Supp. 3d 643, 663–64 (E.D. Mich. Aug. 11, 2015)

(separately considering whether plaintiff had exhausted his child find and manifestation determination claims).

Jo.B., M.B., and Ja.B. did not claim in their original or amended due process complaints that WCS denied a request for evaluation without providing prior written notice[5] or that WCS violated the IDEA's manifestation determination requirements. The factual basis for prior written notice or manifestation determination claims was not developed at the administrative hearing; nor were any such claims decided in the ALJ's final order. The same is true for any claims based on WCS's 2019 special education evaluation of Ja.B. Without the benefit of full administrative exhaustion of those claims, this Court will not consider them. *See Crocker*, 873 F.2d at 935–36.

## B. WCS's Child Find Obligation

Jo.B., M.B., and Ja.B. argue that Ja.B. should have been evaluated for special education while enrolled at MJMS in 2017 or after his disenrollment for the 2017–2018, 2018–2019, and 2019–2020 school years. The IDEA's child find provision requires that "schools must have policies and procedures in place to identify, locate, and evaluate children with disabilities who need special education and related services." *L.M.*, 478 F.3d at 313 (citing 34 C.F.R. § 300.111(a)(1)). This obligation extends to "[c]hildren who are suspected of being a child with a disability . . . and in need of special education, even though they are advancing from grade to grade[.]" 34 C.F.R. § 300.111(c)(1); *see also L.M.*, 478 F.3d at 313. The IDEA's child find

---

[5] Jo.B., M.B., and Ja.B. correctly assert that parental requests for evaluation may provide notice of a child's disability that triggers an LEA's child find obligations. (Doc. No. 29 (citing 20 U.S.C. § 1412(a)(3)(A), 34 C.F.R. § 300.125(a)(1)(I) (2005).) However, an LEA does not *per se* violate the IDEA by denying a parent's request for a special education evaluation. After a parent requests an evaluation under the IDEA, the LEA must perform the evaluation or provide the parent with prior written notice explaining why it refuses to conduct the evaluation. 34 C.F.R. §§ 300.301, 300.503(a)(2), (b)(2). The LEA must also provide the parents with a copy of the procedural safeguards when they request an evaluation. *Id.* § 300.504(a)(1). Neither the original nor the amended due process complaint alleges that WCS failed to comply with these requirements.

provision does not, however, "demand that schools conduct a formal evaluation of every struggling student." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012). "A school's failure to diagnose a disability at the earliest possible moment is not *per se* actionable, in part because some disabilities 'are notoriously difficult to diagnose . . . .'" *Id.* (quoting *A.P. ex rel. Powers v. Woodstock Bd. of Educ.*, 572 F. Supp. 2d 211, 226 (D. Conn. 2008)). To establish a violation of the child find requirement, plaintiffs "must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate." *L.M.*, 478 F.3d at 313 (quoting *Clay T.*, 952 F. Supp. at 823). Because the IDEA and federal and state regulations set forth procedures for determining a child's eligibility for special education and related services, this Court "'strictly review[s]'" compliance with those procedures. *Burilovich*, 208 F.3d at 566 (quoting *Dong*, 197 F.3d at 800); *Deal*, 392 F.3d at 854 (same).

### 1.   Ja.B.'s Enrollment at MJMS

The ALJ found that, "[b]ased on the 3 months available to MJMS and the information about [Ja.B.] that had already been provided, MJMS did not deny [Ja.B.] a FAPE or otherwise violate the IDEA by failing to evaluate [Ja.B.] for Special Education services prior to his disenrollment." (Doc. No. 16-2, PageID# 795, ¶ 222.) The evidence in the administrative record supports this finding.

When Ja.B. enrolled at WCS, he did not have an IEP or a § 504 plan in place, and his Illinois school records and the information provided by his parents did not address special education services. Although his parents expressed concern about his behavior and requested support from his teachers generally, they did not request a special education evaluation. *See D.K.*, 696 F.3d at 247 n.5 ("[W]e cannot conclude that general expressions of concern constitute a "parental *request* for evaluation" under the plain terms of the [IDEA]." (quoting 20 U.S.C.

§ 1415(d)(1)(A)(i))). And the record evidence does not "'show that [WCS] officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate.'" *L.M.*, 478 F.3d at 313 (quoting *Clay T.*, 952 F. Supp. at 823).

Ja.B. was enrolled in WCS for just over three months. (Doc. No. 16-3, PageID# 1838; Doc. No. 16-5, PageID# 2086.) He started school at WCS shortly after a cross-country move, which his parents identified as a probable contributor to his behavioral issues. (Doc. No. 16-3, PageID# 1021; Doc. No. 16-4, PageID# 1960.) WCS's expert witness in special education eligibility determinations, Dr. Stair, testified that, for a student like Ja.B., "whose long-term career has been pre-special education, where the disruptions have been at home, [where] we see nothing in the record that suggests that the behaviors are occurring at school," and who has recently experienced "a major move to another state[,]" school officials "need to give the child time to settle into his environment" before identifying him as a child in need of special education services. (Doc. No. 16-3, PageID# 1831–32.) As Ja.B. began to exhibit behavior problems at school, WCS staff responded by communicating with Jo.B., M.B., and Ja.B. about interventions, including tutoring and counseling services, reminders about consequences, and the use of support tools like an agenda.

After Ja.B. was released from Vanderbilt Psychiatric Hospital at the end of September 2017, WCS staff responded to Ja.B.'s doctor's recommendation and Jo.B. and M.B.'s request for a § 504 plan by initiating the process of developing a § 504 plan for Ja.B. Rainey testified that the process of determining whether a student is eligible for § 504 or special education services involves a data collection regarding the student's needs, making interventions, monitoring the student's response for two-to-four weeks, and adjusting interventions and responses "until you

find out what works for this child." (*Id.* at PageID# 1344–45.) Rainey and Crane testified that WCS uses a tiered "response to intervention" (RtI) approach to ensure that students are not "over identif[ied]" for special education services (*Id.* at PageID# 1344, 1647–49.) Before Ja.B.'s October 30, 2017 § 504 meeting, WCS school psychologist Rachael Wrye met with Bowman and "recommended that RtI B be followed in order to provide[ ] behavioral interventions prior to determining [special education] certification. This is required to ensure LRE for the student." (Doc. No. 16-10, PageID# 2448.)

Utilizing this kind of RtI approach helps a school ensure that students are educated in the least restrictive environment, as the IDEA requires *See L.H.*, 900 F.3d at 789 (quoting 20 U.S.C. § 1412(a)(5)(A)). Tennessee's special education regulations require school districts to use the RtI model to identify students with disabilities. Tenn. Comp. R. & Regs. 0520-01-09-.05(1)(d) ("As a component of child find activities, general education programs within each LEA shall provide and document interventions implemented in the general education program."). Although RtI "cannot be used to delay or deny the provision of a full and individual evaluation . . . to a child suspected of having a disability under 34 C.F.R. § 300.8[,]" an LEA may deny a parent request for an initial evaluation if the LEA does not suspect that the child has a disability requiring special education under the IDEA and can instead be accommodated outside the special education process.[6] U.S. Dep't of Educ., Off. of Special Educ. & Rehab. Servs., OSEP 11-07, A Response to Intervention

---

[6]     An LEA that denies a request for an initial evaluation must provide written notice to parents explaining why the public agency refuses to conduct an initial evaluation and the information that was used as the basis for that decision. 34 C.F.R. § 300.503(a)(2). As explained above, Jo.B., M.B., and Ja.B. have not properly exhausted any prior written notice claims in this action.

25

Case 3:20-cv-00955   Document 31   Filed 02/02/22   Page 25 of 29 PageID #: 2590

(RTI) Process Cannot Be Used to Delay-Deny an Evaluation for Eligibility under the Individuals with Disabilities Education Act (IDEA) (2011).[7]

WCS's approach of applying behavioral interventions and gathering data on Ja.B.'s response is aligned with state guidance for providing interventions for students experiencing behavioral issues. The Tennessee Department of Education has recognized that, where a student exhibits behavioral issues, a student must be observed for an "extended period of time"—"often considered to be two to nine months"—before a school evaluates that student for an emotional disturbance because, while "[s]ome students engage in challenging behavior temporarily, when life circumstances change or traumatic events occur, and behavior or emotional functioning may resolve after initial reactions subside or interventions are in place[,] [s]tudents with emotional disturbance will engage in these behaviors for an extended period of time." Tenn. Dep't of Educ., *Emotional Disturbance Evaluation Guidance* at 20–21 (revised 2018).[8] That approach is especially appropriate where, as here, a student who has not received special education services in the past exhibits behavioral problems after a significant change in circumstances like a cross-country move. When Ja.B. exhibited behavior problems at MJMS, WCS responded reasonably by communicating with Ja.B.'s parents, implementing behavioral interventions, and gathering data to determine whether additional interventions, including a later referral for special education services, would be needed. *See M.G.*, 720 F. App'x at 285 (finding that school district complied with child find requirement by employing "general intervention strategies, such as RtI and [General

---

[7]    https://sites.ed.gov/idea/files/policy_speced_guid_idea_memosdcltrs_osep11-07rtimemo.pdf (last visited Jan. 31, 2022).

[8]    https://www.tn.gov/content/dam/tn/education/special-education/eligibility/se_emotional_disturbance_evaluation_guidance.pdf (last visited Jan. 31, 2022).

Education Intervention Team support], and later an individualized Section 504 plan, to ensure that [student-plaintiff] was making adequate progress). WCS provided support designed to address Ja.B.'s behavioral and academic needs, even though he had not been identified as being disabled within the meaning of the IDEA. *See L.M.*, 478 F.3d at 314 (holding that school district did not violate IDEA's child find obligation where student was not identified as having a disability during his first and second grade years, but school provided specialized instruction and behavior-management strategies during that time). Therefore, Jo.B., M.B., and Ja.B. have not shown that WCS violated the IDEA's child find requirements during Ja.B.'s enrollment at MJMS.

### 2.    Ja.B.'s Disenrollment From MJMS

Nor have Jo.B., M.B., and Ja.B. shown that WCS overlooked clear signs of disability or lacked rational justification in not evaluating Ja.B. for special education services after his disenrollment from MJMS. After Ja.B.'s October 27, 2017 disciplinary incident and subsequent withdrawal from MJMS, his teaching team met with Jo.B. and M.B. to finalize his § 504 plan, which identified his impairments as Generalized Anxiety Disorder and "Other – Conduct Disorder" and included behavioral accommodations based on input from Ja.B.'s teachers, parents, and administrators. (Doc. No. 16-5, PageID# 2093–96.)

While a § 504 plan cannot be used as a substitute for an IEP where a student requires special education services under the IDEA, *see, e.g.*, *Yankton Sch. Dist. v. Schramm*, 93 F.3d 1369, 1376 (8th Cir. 1996), a diagnosed disability and demonstrated behavior problems do not automatically establish that a student needs special education services under the IDEA because of their disability, *see, e.g.*, *Alvin Indep. Sch. Dist. v. A.D. ex rel. Patricia F.*, 503 F.3d 378, 384 (5th Cir. 2007). Ja.B.'s passing grades at the time of his disenrollment, the lack of prior opportunity for WCS to develop and implement Ja.B.'s § 504 plan and observe his response to § 504 accommodations, the short timeframe of his enrollment at MJMS, and the possibility that his increased behavior issues

27

were due to his recent cross-country move all show that it was reasonable for WCS to proceed with the § 504 process instead of referring Ja.B. for special education services. *See Doe v. Cape Elizabeth Sch. Dep't*, 382 F. Supp. 3d 83, 102–03 (D. Me. 2019) ("[W]hile [the LEA] undoubtedly could have referred [student plaintiff] to special education on the same day she received a referral for a Section 504 plan, [the LEA] was not statutorily obligated to do so . . . . In effect, it was reasonable for [the LEA] to conclude that [student plaintiff]'s particular circumstance did not require special education services as much as modifications to her schedule, performance deadlines, attendance requirements, designated public school setting, and the like, to accommodate her anxiety triggered by a dysfunctional home life."); *see also J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 663 (S.D.N.Y. 2011) ("[E]ven if the District should have known at this point that [the student] had [a disability]—as opposed to merely thinking she was merely going through a difficult time in her life—the IDEA's child find requirement only applies to children who are disabled *and* in need of special education and related services.").

After withdrawing Ja.B. from MJMS, Jo.B. and M.B. met with WCS staff in February and June of 2018. As the ALJ concluded, there is no indication that they requested an IEP evaluation at either meeting or provided any additional information "that would have suggested the need for specialized instruction through an IEP in order to access his education and receive a FAPE." (Doc. No. 16-2, PageID# 795, ¶ 23.) Although Ja.B.'s parents testified that they told school personnel about the results of a private neuropsychological evaluation conducted by Dr. Jackie Klaver after Ja.B. withdrew from MJMS, nothing in the record indicates that Klaver's findings would have shown that Ja.B.'s diagnoses required special education services under the IDEA instead of his existing § 504 plan. *See* 20 U.S.C. § 1412(a)(3)(A) (requiring states to identify, locate, and

evaluate "[a]ll children with disabilities residing in the State . . . *who are in need of special education and related services*" (emphasis added)).

The Court finds that Jo.B., M.B., and Ja.B. have not shown that WCS "overlooked clear signs of disability" or "negligent[ly] [ ] fail[ed] to order testing" after Ja.B's disenrollment, *L.M.*, 478 F.3d at 313 (quoting *Clay T.*, 952 F. Supp. At 823); thus, they have not carried their burden of showing that WCS denied Ja.B. a FAPE, and Ja.B. is not entitled to the equitable remedy of compensatory education. The Court also does not need to consider whether CATES Academy and Meridell were appropriate placements under the IDEA to find that Ja.B.'s parents are not entitled to reimbursement for the costs of those private placements.

## IV.     Recommendation

For the foregoing reasons, the Magistrate Judge RECOMMENDS that Jo.B., M.B., and Ja.B.'s motion or judgment on the administrative record (Doc. No. 23) be DENIED and that the ALJ's decision be AFFIRMED.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 2nd day of February, 2022.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge